| | |
|---|---|
| **MCShapiro Law Group PC** | **Law Advocates LLC** |
| Mitchell C. Shapiro, Esq. (MS-9019*)* | Douglas A. Goldstein, Esq. (DG-5891) |
| Three Grace Avenue, Suite 100 | 236 Millbrook Ave, Ste 3R |
| Great Neck, New York 11021 | Randolph, New Jersey 07869 |
| Tel: (917) 446-3628 | Tel: (973) 845-6526 |
| Email: MCS@MCShapiroLaw.com | Email: DGoldstein@Advocates.Esq |

*Attorneys for Defendants-Appellants Michael E. Crane and Daniel M. Crane*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>CRANE ENTERPRISES, LLC,<br><br>               Debtor. | Civil Case No. 25-cv-6793 (DC) (RT)<br><br>Chapter 11<br><br>No. 25-10405 (DSJ) |
| CRANE ENTERPRISES, LLC,<br><br>               Plaintiff,<br><br>               -vs-<br><br>MICHAEL E. CRANE, DANIEL M. CRANE, JOHN DOE AND JANE DOE (Fictitious Persons)<br><br>               Defendants. | Adv. Pro. No. 25-01040 (DSJ) |

**DECLARATION OF MICHAEL E. CRANE IN SUPPORT OF**
**MOTION FOR STAY PENDING APPEAL**

I, MICHAEL E. CRANE, declare as follows:

    1.    I am an individual over eighteen (18) years of age and I and my adult son, Daniel M. Crane, are the named defendants-appellants in this case regarding the cooperative apartment located in Long Beach (the "Apt.") that is our home, and which I understand is the subject of this proceeding and the sole asset of the Debtor in bankruptcy, Crane Enterprises LLC ("CE"). I make this declaration, and all statements contained herein, based upon my personal knowledge

and/or a review of the public Court files and files from other public court proceedings, and except as to those stated on information and belief and, as to those, I am informed and believe them to be true. If called to testify, I would do so truthfully and consistent with the following.

2. I was also the sole named defendant in the matter styled as Crane Enterprises, LLC v. I Crane et al., Index No. LT-004282-22 in the District Court of the State of New York, County of Nasau: First District; Hempstead (the "L-T Action"). It is my understanding that the Executor of the Estate commenced this Bankruptcy Proceeding and the instant adversary proceeding in an attempt to enforce the order granting a judgment of possession and warrant of eviction that the District Court issued in the L-T Action (ECF No. 6, Exh "J", the "L-T Order"), and to enforce it against both me and Daniel.

3. I am fully familiar with the prior submissions in this action and the Main Proceeding, as well as the L-T Action, and in particular the five declarations that Daniel and I previously submitted in opposition to or support of various motions, namely ECF Doc. 7-2 ["D.CraneDecl#1"], dated June 12, 2025; ECF Doc., 7-3 ["M.CraneDecl#1"]; dated June 12, 2025]; ECF Doc. 12-1 ["M.CraneDecl#2"], dated August 13, 2025] and Exhibit 1 annexed thereto [my L-T Action PostTrial Memorandum and its exhibits]; ECF Doc. 12-2 ["D.CraneDecl#2"], dated August 13, 2025;, and ECF Doc., 19-1 ["M.CraneDecl#3", dated August 19, 2025]. For the Court's convenience, I am restating herein, in chronological order, the background facts and procedural history previously recited in those prior declarations, which I stand by as true and accurate today. I am also addressing certain new, false allegations and mistaken conclusions expressed by Debtor counsel Snyder and by Hon. Bankruptcy Court Judge Jones during the August 20, 2025 hearing.

4. For starters, the Apt. is not worth more than $600,000. The Debtor submits no actual evidence other than a broker estimate of how she would list the Apt.. In fact, the Estate Administrator who authorized the filing of the Petition and this Adversary Proceeding on behalf of the Debtor listed the Apt. as worth only $483,750.00 on the recent accounting that was filed in connection with the Estate. A true and correct copy of the first and last and relevant pages of the February 28, 2025 Estate Accounting was attached as Exhibit "N" to the first Declaration that I submitted in this proceeding, in opposition to summary judgment the M.CraneDec#1, ECF No. 7-3. The value of the co-op unit is described on page 34 of that accounting.

5. Under the proposed plan of bankruptcy, there will be virtually nothing left for the Debtor's Estate or the creditors (other than the counsel for the Debtor, who has put in a claim for $350,000 in fees incurred on an entirely separate bankruptcy concerning a different Debtor corporation). (Id.).

6. This is the same game that the Estate and its same counsel played in the Treasures & Gems Ltd. case, in which they avoided a negative outcome in the state court proceedings for specific performance of a sale of the sole property of that entity that would have resulted in a distribution to the Estate of at least six figures, and instead provide an inflated and inaccurate appraisal of that property in order to justify their bankruptcy proceeding, went through the bankruptcy proceedings and ended up selling the property for only slightly more than the original contract (and a mere fraction of the inflated debtor appraisal) resulting in the bank and the professionals receiving hundreds of thousands of dollars more than under the specific performance proposal, and generating nothing for the beneficiaries of the estate, me and my sister.

7. The difference here is that the Apt. is the last asset left from the estate and trust of my mother and aunt, other than the Fort Lee NJ cooperative apartment that the administrator has apparently let my sister Jacqueline keep, apparently to keep her cooperating with him as he dissipates all of my family's assets and pays himself and my lawyers millions of dollars after liquidating our assets at discounted prices and delivers nothing but that Fort Lee NJ apartment to my sister and tax bills to us for the estate from which I have gotten nothing.

8. The real properties listed in the CE operating agreement as having been contributed to the CE by my mother and aunt were subsequently sold and the LLC purchased other properties in 1031 exchanges that ultimately led to the purchase of the Apt. as the sole remaining property of CE.

9. If Daniel and I are evicted, we will effectively be homeless.

*History of the Debtor, the Apt. and Initial State Court Disputes*:

10. The 2010 operating agreement of CE states that my mother Joyce Crane and my aunt Rhoda Crane were the managing members, and I was the third member and thus had ownership of the entity that owned the Apt.. ECF 7-6, Exh.O, Operating Agreement. The Apt. is a cooperative Apt., and the building and property is owned by the cooperative association known as Xander. CE has a possessory right leasehold interest by virtue of owning shares in the cooperative associations.

11. On August 26, 2014, the Debtor, as over-tenant, entered into a lease with Daniel and I, as subtenants, which granted Daniel and I a leasehold interest in the Apt. for a term beginning September 1, 2014 and that:

> … end[s] on the earlier of (A) the date that is sixty (60) days after the death of [Daniel and I], or (B) the date that [Daniel and I], or

M.CraneDecl#4 08252025                                   4

> [Daniel and I'] estate or heirs, surrender possession of the Apt. to [the Debtor] in the condition required by this Lease. Both [the Debtor] and [Daniel and I] expressly agree and acknowledge that there are succession rights to the Apt., and [Daniel and I'] Leasehold can be devised, gifted, or passed to any person.

See ECF No. 6, SJ Motion, Exhibit F (signed by Joyce, a managing member). ECF No. 6, SJ Motion, Exh. F. The lease was signed by my mother Joyce, while she was of sound mind.

12. It is notable that, at roughly the same time that I (and Daniel) received the lifetime lease for the Apt., my mother and aunt purchased the cooperative apartment in Fort Lee using their own funds in 2014 -- I have seen the closing statement and source of funds for the purchase -- and they gifted my sister Jacqueline membership interests in that Apt., so that we each would have places to live once the older generation passed on.

13. Since mid-2020, Daniel and I have resided in and maintained the Apt. For a short period of time in 2020, I was living in my mother's Fort Lee apartment (that now belongs to my sister), while caring for my mother and then following her death, until her lawyers and the Administrator joined forces to have me ejected from that apartment. (I find it curious and suspicious that the Administrator backed off of the claims to the Fort Lee apartment and apparently allowed my sister to keep that apartment.) In their filings over the Fort Lee apartment, they suggested that I move into two vacant apartment in a mixed use building located in Manhattan that was owned by another Crane entity that I had been managing for more than a decade, and then they turned their sights on that building while I was living there.

14. I understand that Attorney Snyder quoted a declaration that I submitted in another proceeding in which I correctly and accurately stated that I was living in that building at the time, in a rent stabilized apartment. What I submitted was true at the time; the Long Beach Apt. was not liveable at the time. I soon thereafter cleared out the Long Beach Apt., was able to live there again,

and moved back to the Apt..

15. Contrary to the Debtor's contentions, which misrepresented the testimony given at Daniel's deposition, despite his lengthy term as a student studying overseas, Daniel is still a resident of New York and fully intends to return to live full time at the Apt.. See ECF No. 18-2, Transcript of July 9, 2025 D.Crane deposition.

16. Despite Attorney Snyder's accusatory skepticism, and his misrepresentations of the deposition testimony, Daniel has been studying at a yeshiva in Israel and has always planned to return home to the Apt., and will do so shortly. See D.CraneDecl#1, ¶8, D.Crane Depo Transcript.

17. Since mid-2020, Daniel and I have paid the necessary carry costs, including, without limitation, insurance premiums and, until approximately July 2022, cooperative fees and assessments. Daniel and I only stopped paying Xander the cooperative maintenance fees because Xander refused to continue accepting them from Daniel and me, on the instructions of the Debtor. See M.CraneDecl#2, ¶2-3; see also D.CraneDecl#2, ¶2. I note that Repetto's declaration in opposition to our motion for a stay pending appeal in the Bankruptcy Court merely stated that he had never told me or Daniel not to pay Xander. Note that his clever drafting does not deny, and hides the fact that he or one of his agents instructed Xander not to accept any payments from Daniel or me.

18. Since that time, Daniel and I continued to maintain the Apt. and pay carry costs other than those that Xander has refused, including, without limitation, paying the insurance policy for the Apt.. Daniel and I have been and continue to be ready, willing and able to pay Xander the coop fees and to protect the Debtor against a depreciation of its interest in the Apt.. See M.CraneDecl#1, ¶¶4-6; D.CraneDecl#1, ¶¶3-6.

19. After my aunt Rhoda and mother Joyce both passed away in 2020, my sister

M.CraneDecl#4 08252025                    6

Jacqueline commenced disputes over where our mother Joyce was to be buried, and over assets, and multiple lawsuits were filed in New York State Supreme Court. In those initial cases, Jacqueline made a series of scurrilous, unfounded allegations against me, and I sought to restrain Jacqueline from interfering with my continuing management of the properties. In those initial state court proceedings, which were commenced in 2020 and publicly filed and available on NYSCEF, I introduced, among other things, the 2010 operating agreement of CE that included him as a member, the power of attorney signed by my mother Joyce and notarized by Anthony G. Talarico, Esq. in NJ in 2003, and the lifetime Lease.

20.  I and my sister reached an agreement to allow me to continue to manage the remaining commercial property (located on 2nd Ave.), as I had been doing for more than a decade, without further interference. That took the form of a stipulated order which was entered by the New York County Supreme Court and so ordered on January 25, 2021. I complied with the requirements of the stipulated order and kept Jacquiline sister informed of the status of the pending refinancing of the commercial property and to provide bank and financial information. I complied with all of my obligations (despite the ongoing, baseless allegations that I "stole" money from the refinancing and from the property).

21.  Following that agreement (which was a stipulation filed with the Court), Jacqueline then moved to dismiss the pending New York State Court actions, arguing that the yet-to-be appointed New Jersey administrators over the trust and estate of Joyce and Rhoda were necessary parties to any lawsuits and that the New York actions should be dismissed due to the pendency of the estate administration proceedings in New Jersey. The assigned justices dismissed the New York actions, without prejudice, due to the pendency of the estate proceedings in New Jersey.

***Dispute with Administrators and 2022 NJ Order***:

M.CraneDecl#4 08252025 7

22. I had opposed the appointment of the administrators in New Jersey as an unnecessary and counterproductive expense. When the New Jersey court appointed administrators, they refused to consummate or honor a contract to sell the commercial property on 2nd Avenue and sought to void leases for the commercial spaces at that property, which I had signed as the longstanding manager of that property, and demanded that I cede control over my family's entire legacy to them.

23. As I had feared when opposing their appointments, the administrators then began to run up huge bills that exceed the prices for which they sold the Crane estates' property (and were willing to take discounted prices). For example, the administrators were prepared to sell the house to a buyer for $750,000, and I himself quickly found a buyer to pay $850,000. Then, the contents of Rhoda's house, which included Crane family heirlooms and irreplaceable photographs, was appraised at a value of approximately $61,000 (reduced to $56,000 after the administrator were forced to return my personal property that he proved with a mover's bill of lading was his), and the administrators rejected my offer to buy the contents for that price and instead sold it to the contractor that they had hired to clean out the house for approximately $44,000. Moreover, while the administrators were disputing My right to the return of my own personal property, they ran up approximately $11,000 in costs of storage for that property.

24. Even my sister, who backed the Administrators in her battle with me over our mother's final care and resting place, is starting to get the picture. Indeed, in the estate and trust proceedings that are ongoing in New Jersey, she submitted a letter recently in which she claims to have not gotten a dime from the estate, yet received a tax bill for $900,000.

25. The administrators managed to procure an order from the New Jersey court -- which was rendered on default once I refused to turn over all of my property to the administrators and to

recognize their purported authority – declaring that I was not a member of either of the Crane entities, including CE (a New York LLC), and giving the administrators the right to seize, administer and manage all assets and property belonging to the companies owned by the estate and the trust, including CE. ECF No. 6, Exh. A (the "2022 NJ Order"). The 2022 NJ Order struck the administrator's proposed findings that I had engaged in fraud and, likely in recognition of the "internal affairs doctrine", noted that the administrators were required to take the additional steps necessary to remove I as a manager or member of the NY LLC. *Id.* The Administrator never took any steps to remove I as a member or manager of CE. It merely bought a New York Nassau County Index number, filed the 2022 NJ Order and then did not serve I and did nothing to effectuate a domestication of the order.

### *NYS District Court L-T Actions and 2024 L-T Order*:

26. On or about December 13, 2022, the Administrator initiated a landlord-tenant eviction action (the "L-T Action") in the District Court of the State of New York, County of Nassau, First District, Hempstead (the "District Court"), under Index No. LT-004282-22, in the name of the Debotor, against I, alone, and "John Doe" and "Jane Doe" placeholders, based on the premise that I did not have a lease with the Debtor. See ECF No. 7-7, SJ Objection, Exhibit P, L-T Petition.

27. There is no evidence that the Debtor made any attempt to ascertain the identity of the "John Doe" and "Jane Doe" defendants, whether before or after initiating the L-T Action, nor did the Debtor make any such allegation. In addition, at the trial of the L-T Action, the Lease was introduced into evidence. Still, the Debtor did not move during the proceeding to name, join or substitute Daniel as a defendant. See M.CraneDecl#1, ¶9.

28. The Debtor did not disavow the Lease during the L-T Action and instead claimed

*M.CraneDecl#4 08252025*                     9

that it was unenforceable as a lease that was for more than a three-year duration and was not recorded with the Nassau County Clerk. See M.CraneDecl#2, ¶10. By its terms, it was a lifetime lease, not a lease for any set years. In the L-T Action, I and my lawyers presented the applicable law and a letter from the Nassau County Clerk's office confirming that they could not record a copy of a lease, and even if they could, they would not because "we [Nassau County] do not record private leases." Id., ¶11; see also ECF No. 12-1, Exh 1, Exh. C.

29. On November 18, 2024, after a trial of the matter, the District Court issued an Order in favor of the Debtor and against I in the L-T Action (the "2024 L-T Order"), which did not address the issues raised by me and my L-T Action counsel in opposition to the Debtor's petition. See ECF 6, SJ Motion, Exhibit H; see also ECF No. 12-1, Exh 1, my L-T Action Posttrial Memorandum.

30. At the most recent hearing held on August 20, 2025, Debtor's counsel Snyder made a number of misrepresentations. One of them was the statement that "another court found the Lease to be invalid" 08202025 Tr. at p. 40. That is not true. No court actually issued a ruling regarding the Lease, and the L-T Order did not even mention, let alone invalidate or void the Lease.

31. The L-T Order seems to have been based on a misunderstanding or overlooking of New York law or the Lease, or both, and without making a finding that the proceedings were properly commenced by a representative of the Debtor with authority to do so. See Main Case, ECF No. 18, July 2, 2025 Declaration of Jonathan Kroll, Esq., counsel in L-T Action, submitted in support of Motion for Relief From Automatic Stay ("KrollDecl#1"), ¶9. The L-T Order was issued on November 18, 2024, Notice of Entry was filed on December 4, 2024 and a Notice of Appeal was dated on December 20, 2024 and stamped filed on December 23, 2024. See ECF No. 8, SJ Reply, Exhibit G.

32. I understand that the Bankruptcy Court has been convinced by Attorney Snyder that I have been dilatory and that I have engaged in gamesmanship. That is not true.

33. I have not delayed and have just had to allocated my limited resources (since the Administrator has taken away my sources of income that I counted on for years) and find lawyers willing to donate time to a worthy cause and the pursuit of justice, and to work on their available schedules. Moreover, based on what the clerk of the Appellate Term told my lawyer in the L-T Action, we understood that the L-T Order was not final until the judgment was entered by the clerk of the court as an actual judgment and that any pending appeal would be considered interlocutoryu and mooted by the entry of a judgment. We were allocating time to work on perfecting the appeal when the Administrator and debtor's counsel bombarded me with a huge drain on resources in another case in December, January and February, and then as soon as we saw a clear path forward, the Administrator filed the bankruptcy proceeding on March 4, 2025, filed notices of bankruptcy and stayed the L-T Action and any appeal.

34. My lawyers and I previously represented to the Bankruptcy Court that we would have had the appeal fully briefed in the Appellate Term by September 22, 2025. That is still our plan, however it seems that the appeal would be mooted if the eviction order is not stayed pending appeal.

35. It is the Debtor and its lawyers who are playing games, and using the Bankruptcy Court to cut short my appellate rights and to short circuit my due process rights.

36. Daniel intends to intervene in state court proceeding to join me in challenging the 2024 L-T Order on its merits and assert our rights to occupy the Apt. under the Lease. See D.CraneDecl#2, ¶9.

**<u>Bankruptcy Proceedings</u>:**

37. On March 4, 2025, the Debtor initiated this bankruptcy case by filing a petition under Chapter 11 of the Bankruptcy Code under case no. 25-10405 (DSJ) (the "Main Case"), in which the only creditors are Xander and debtor's counsel (with fees accruing to the estate from another unrelated debtor bankruptcy proceeding). On March 5, 2025, the Debtor initiated this adversary proceeding by filing a Complaint (ECF No. 1) and, on April 22, 2025, Daniel and I filed our Answer (ECF No. 3). On May 22, 2025, the Debtor filed its Motion for Summary Judgment (ECF No. 6) (the "SJ Motion"), seeking entry of judgment directing Daniel and I to turn over possession of the Apt..

38. The Debtor contended that, because the Lease was not recorded with the Nassau County Clerk, the Lease is void. (See ECF SJ Reply, ¶¶22-28), a point that My counsel rebutted in my post-trial brief (ECF No. 12-1, Exh. 1 at p. 2 and Exh. C annexed thereto).

39. In response, on June 12, 2025, Daniel and I filed their objection to the SJ Motion (ECF No. 7), which included lengthy and detailed declarations made by Daniel and I (ECF 7-2, D.CraneDecl#1, ECF 7-3, M.CraneDecl#1) (collectively, the "SJ Objection"). In brushing aside its failure to name Daniel as a party to the L-T Action after the Lease—which identifies Daniel as a co-tenant—was introduced into evidence at trial, the Debtor contended in the SJ Motion that *res judicata* based on privity with I bars Daniel from arguing that its failure to join him was fatal to the L-T Action and the validity of the 2024 L-T Order against him. See ECF 6, SJ Motion, ¶33-34; M.CraneDecl#1, ¶9.

40. Among other things, my lawyers asserted that: the bankruptcy stay cut off my appellate right to challenge the 2024 L-T Order before the final judgment was ever entered by the Clerk and the appeal was from a final judgment; the Debtor never served Daniel, a signatory to the Lease, in the eviction proceeding, Daniel retains my full defenses, he cannot be evicted under the

*M.CraneDecl#4 08252025*          12

2024 L-T Order, and he is entitled to present my defenses in the District Court; and I am the sole member and managing member of the Debtor and the Administrator failed to procure proper authority before commencing the L-T Action (see ECF No. 7-3, M.CraneDecl#1 ¶¶7-8) and did not authorize the appointment of Mr. Repetto to take control of the Debtor; and Mr. Repetto has not complied with the directives of the New Jersey probate court to perfect my purported right to take control of the Debtor, and has not sought ancillary letters in New York (see ECF No. 7-3, M.CraneDecl#1, ¶9; ECF 12-1, M.CraneDecl#3, Exh 1 at p. 2).

41. In response, on June 19, 2025, the Debtor filed its reply (the "SJ Reply"). On June 26, 2025, the Bankruptcy Court conducted oral argument on the SJ Motion and, on July 29, 2025, filed its Decision Granting Plaintiff's Motion for Summary Judgment (ECF No. 10) (the "SJ Opinion"). On July 30, 2025, the Bankruptcy Court entered the SJ Order (ECF No. 11).

42. In the Main Case, on July 3, 2025, Daniel and I filed a Motion for Relief from the Automatic Stay to Proceed with Pending State Court Action (Main Case, ECF No. 18) (the "Automatic Stay Relief Motion"). On July 14, 2025, the Debtor filed its objection to the Stay Relief Motion (Main Case, ECF No. 21) and, on July 16, 2025, Daniel and I filed their reply in support of the Stay Relief Motion (Main Case, ECF No. 23). On July 17, 2025, the Bankruptcy Court conducted oral argument on the Stay Relief Motion and, on August 8, 2025, the Bankruptcy Court filed its Decision and Order granting the Stay Relief Motion (Main Case, ECF No. 31) ("Automatic Stay Relief Decision") and entered an order on August 14, 2025. ECF No. 34 ("Automatic Stay Lift Order"). The Bankruptcy Court also denied Daniel and I' request to shorten the 14-day period in which the lifting of the automatic stay would commence, thus effectively preventing Daniel and I from being able to seek a stay of eviction pending appeal from the NYS Appellate Term until after the Bankruptcy Court could issue its own final order of eviction). Id.

43. Daniel and I timely filed a Notice of Appeal of the SJ Motion (ECF No. 13) and a motion seeking to alter or amend the Bankruptcy Court's award of summary judgment (on reconsideration), or in the alternative, to seek its vacatur, because the Bankruptcy Court overlooked several arguments that justify the denial of possession to the Debtor and eviction of Daniel and I from their only remaining home (ECF No. 12). That motion alternatively asked the Bankruptcy Court to grant a stay of the SJ Order pending the appeal of the 2024 L-T Order in NYS Court (and the SJ Order in this Court), to allow Daniel and I to remain in the Apt. while pursuing their appellate remedies. *Id.* Debtor filed a separate motion seeking an order of eviction (ECF No. 14). The Court then issued a scheduling order with opposition papers/objections to each motion to be filed by 12 noon on August 19, 2025 with oral argument to take place the next morning (ECF No. 16, Scheduling Order). Each side timely filed its opposition/objection papers (ECF Nos., 18 and 19) and the Bankruptcy Court held oral argument at 10:00 am on August 20, 2025, the day after objections/oppositions to the dueling motions were filed. Then, only hours later the Court issued a lengthy 21-page Bench Decision that denied any relief to Daniel and me, gave Debtor the right to evict us (ECF 21, "Eviction Decision"), and then entered an order of eviction on August 24, 2025 (ECF 23, "Eviction Order").

44. The Eviction Order included self-help lockout by expressly permitting it to change the locks on the Apt. and notify Xander (who will then bar access to the property and Apt.) if Daniel and I "in the event that the Crane Defendants do not first procure a stay of eviction pending appeal from another Court and do not voluntarily vacate and turnover the Apt. to the Debtor on or before 11:00 a.m. on September 5, 2025" (ECF No. 23).

45. The Apt. is Daniel and my primary and sole residence. If Daniel and I are evicted from the Apt., we will not have anywhere to move and will be left homeless. See M.CraneDecl#3,

M.CraneDecl#4 08252025                           14

¶8; D.CraneDecl#3, ¶7.

46. I respectfully request that this Honorable Court grant our instant motion for stay of the eviction order, and the summary judgment order, pending appeal.

*I declare under penalty of perjury under 28 U.S.C. § 1746 and the laws of the United States of America and the States of New York that the facts set forth above are true and that I affixed my signature to this Declaration on August 25, 2025.*

Signed by: *Michael E. Crane*    8/25/2025 | 8:13:22 AM PDT

MICHAEL E. CRANE

 docusign

## Certificate Of Completion

| | | |
|---|---|---|
| Envelope Id: 376C1991-5461-4E0D-AC5A-AACD5A1984A3 | | Status: Completed |
| Subject: Complete with Docusign: Michael Crane Declaration #4 Stay Pending Appeal vf.pdf | | |
| Source Envelope: | | |
| Document Pages: 15 | Signatures: 1 | Envelope Originator: |
| Certificate Pages: 1 | Initials: 0 | Mitchell C. Shapiro |
| AutoNav: Enabled | | Three Grace Avenue |
| EnvelopeId Stamping: Enabled | | Suite 100 |
| Time Zone: (UTC-05:00) Eastern Time (US & Canada) | | GREAT NECK, NY  11021 |
| | | mcs@mcshapirolaw.com |
| | | IP Address: 195.181.168.162 |

## Record Tracking

| | | |
|---|---|---|
| Status: Original<br>         8/25/2025 11:08:08 AM | Holder: Mitchell C. Shapiro<br>                 mcs@mcshapirolaw.com | Location: DocuSign |

| **Signer Events** | **Signature** | **Timestamp** |
|---|---|---|
| Michael E. Crane<br>mecrane721@gmail.com<br>Security Level: Email, Account Authentication (None) | Signed by:<br>*Michael E. Crane*<br>4389FEF66A714BB...<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 46.193.69.183<br>Signed using mobile | Sent: 8/25/2025 11:08:58 AM<br>Viewed: 8/25/2025 11:12:06 AM<br>Signed: 8/25/2025 11:13:22 AM |
| **Electronic Record and Signature Disclosure:**<br>     Not Offered via Docusign | | |

| **In Person Signer Events** | **Signature** | **Timestamp** |
|---|---|---|

| **Editor Delivery Events** | **Status** | **Timestamp** |
|---|---|---|

| **Agent Delivery Events** | **Status** | **Timestamp** |
|---|---|---|

| **Intermediary Delivery Events** | **Status** | **Timestamp** |
|---|---|---|

| **Certified Delivery Events** | **Status** | **Timestamp** |
|---|---|---|

| **Carbon Copy Events** | **Status** | **Timestamp** |
|---|---|---|

| **Witness Events** | **Signature** | **Timestamp** |
|---|---|---|

| **Notary Events** | **Signature** | **Timestamp** |
|---|---|---|

| **Envelope Summary Events** | **Status** | **Timestamps** |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 8/25/2025 11:08:58 AM |
| Certified Delivered | Security Checked | 8/25/2025 11:12:06 AM |
| Signing Complete | Security Checked | 8/25/2025 11:13:22 AM |
| Completed | Security Checked | 8/25/2025 11:13:22 AM |

| **Payment Events** | **Status** | **Timestamps** |
|---|---|---|